SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. CLAY, J. (pp. 586-93), delivered a separate dissenting opinion.
OPINION
SUTTON, Circuit Judge.
Steve Black, a truck driver for Western Express, drove a load of raw paper materials to a factory operated by Dixie Consumer Products in Bowling Green, Kentucky. During the unloading process, a careless Dixie employee ran over Black’s foot with a forklift. Black received workers’ compensation from Western due to the injury. He then filed a tort claim against Dixie and its parent company, Georgia-Pacific. The district court denied Dixie and Georgia-Pacific’s motion for summary judgment. Because Kentucky’s workers’ compensation statutes provide an exclusive remedy for injuries of this sort, we reverse the decision of the district court.
I.
Dixie makes paper cups and plates out of raw paper material. Forty-eight different truck and freight service providers carry the raw paper to the Bowling Green factory. One of them is Western, which agreed to “transport and deliver shipments of contract freight from facilities or other designated locations to the various destination points.” R. 14-2 at 2.
On the day of the accident, Black drove a Western truck, loaded with 41,214 pounds of pulpboard, to the factory. Ten-pound rubber mats separated the heavy paper rolls and secured the load on its journey to Bowling Green. After parking his truck, Black received permission from Larry Chinn, the Dixie forklift operator, to enter the loading dock through a locked cage designed to keep pedestrians off the loading dock. It was “[cjommon practice,” as Black understood, for the truck driver to unload the rubber mats' so that the Dixie forklift operator did not “have to get off each time and get” them himself. R. 84-12 at 7,12.
Chinn and Black soon got “into a rhythm” in unloading the materials. R. 84-9 at 22. Chinn would remove a layer of paper rolls with his forklift. And Black would remove the rubber mats and walk them to the trash compactor. At some unfortunate point, they fell out of rhythm, and Chinn ran over Black’s foot with the forklift, leading to a below-the-knee amputation of Black’s leg.
Black received workers’ compensation from Western due to the injury.
He then filed this tort action against Dixie and Georgia-Pacific, seeking $1,850,000 in damages.
Dixie and Georgia-Pacific answered that the exclusive nature of the Kentucky Workers’ Compensation Act barred Black’s claims. See Ky. Rev. Stat. §§ 342.610(2), .690. “After minimal discovery,” the district court agreed. Black v. *582 Dixie Consumer Prods. LLC, 516 Fed.Appx. 412, 413 (6th Cir. 2013). The district court rejected Black’s claim as a matter of law due to the exclusive nature of the Kentucky law, granting summary judgment to Dixie and Georgia-Pacific.
Our court reversed because the record was insufficiently developed. In particular, the evidence did not show whether “the work Black performed at the time of his injury was a regular or recurrent part of [Dixie’s] work.” Black, 516 Fed.Appx. at 417. “[I]n order to find that the transportation of raw paper materials between a supplier and Dixie is a ‘part of Dixie’s work,” a precondition for contractor immunity under Kentucky law, “Dixie must demonstrate both that this type of transportation is a ‘customary, usual, or normal’ part of Dixie’s business or ‘work that [Dixie] repeats with some degree of regularity’ and that it is work that Dixie or similar businesses would normally perform or be expected to perform with employees.” Id. (quoting Gen. Elec. Co. v. Cain, 236 S.W.3d 579, 588 (Ky. 2007)).
On remand, the parties introduced additional evidence about the nature of this transport service. As the district court saw this evidence, it did not show that Dixie and Georgia-Pacific were entitled to immunity from this lawsuit and thus it denied their motion for summary judgment.
II.
Denials of summary judgment are not final orders. And we have jurisdiction only over “final decisions of the district courts.” 28 U.S.C. § 1291. But there are a few exceptions, a few times when the courts of appeals will review non-final orders on an interlocutory basis. The key exception is the collateral-order doctrine. Under it, a party may appeal a non-final order only “if it (1) conclusively determines the disputed question; (2) resolves an important issue separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment.” Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 105, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009) (quotation omitted); see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
The Supreme Court has frequently applied the collateral-order doctrine in the context- of decisions rejecting immunity-from-suit defenses. The best known, and most frequently invoked, immunity-from-suit cases involve claims of sovereign immunity, absolute immunity, and qualified immunity raised by governmental entities and individuals. In all three settings, the losing party may appeal the rejection of an immunity defense immediately because the core point of “immunity is its possessor’s entitlement not to have to answer for his conduct in a civil damages action.” Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (qualified immunity); see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (state sovereign immunity); Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (absolute immunity).
Not all invocations of the word “immunity,” however, satisfy this exception. What matters is the “nature of the protection,” as opposed to “the loose ability of an attorney to use the term ‘immunity.’ ” Kelly v. Great Seneca Fin. Corp., 447 F.3d 944, 950 (6th Cir. 2006). And what counts in terms of protection is whether the relevant state or federal law “provides immunity from suit rather than immunity from liability.” Sabo v. City of Mentor, 657 F.3d 332, 336 (6th Cir. 2011); see Range v. Douglas, 763 F.3d 573, 581 (6th Cir. 2014); *583 Chesher v. Neyer, 477 F.3d 784, 793 (6th Cir. 2007).
Under Kentucky law, a contractor has immunity from negligence actions (in return for providing backup workers’ compensation coverage) when “the worker was injured while performing work that was of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of the owner,” no matter whether “the immediate employer actually provided workers’ compensation coverage.” Cain, 236 S.W.3d at 585. Often called “up-the-ladder” contractor immunity, it establishes an immunity from suit, not just from liability. Black concedes as much. See Appellee’s Br. 5, 20. Dixie and Georgia-Pacific agree. See Appellant’s Br. 36, 44-45. Kentucky courts agree, too. The Supreme Court of Kentucky describes up-the-ladder immunity as “a contractor’s immunity from tort lawsuits.” Beaver v. Oakley, 279 S.W.3d 527, 528 n.1 (Ky. 2009); see Dilts v. United Grp. Servs., LLC, 500 Fed.Appx. 440, 449-50 (6th Cir. 2012) (Clay, J.) (quoting the Beaver footnote). The immunity plays a .pivotal role in maintaining the tradeoffs contained in Kentucky’s workers’ compensation scheme. See Cain, 236 S.W.3d at 587. Consistent with the reality that up-the-ladder immunity insulates contractors from lawsuits, not just liability, and consistent with the give-and-take nature of all workers’ compensation systems, Kentucky courts themselves allow immediate appeals from an interlocutory order denying a private contractor’s immunity. Ervin Cable Constr., LLC v. Lay, 461 S.W.3d 422, 423 (Ky. Ct. App. 2015).
Kentucky courts, it is true, at times refer to contractor immunity as “immunity from liability,” Beaver, 279 S.W.3d at 528, as our colleague points out in dissent. But this is unsurprising given that an immunity from suit includes an immunity from liability. What matters is that Kentucky treats the immunity as an “absolute immunity, the denial of which is subject to immediate appeal since immunity is designed to free the possessor not only from liability, but also from the costs of defending an action.” Ervin Cable Constr., 461 S.W.3d at 423. We ourselves use both “immunity from suit[ ]” and “immunity] from liability” to describe immunities of such magnitude, sometimes in back-to-back sentences. Brookings v. Clunk, 389 F.3d 614, 617 (6th Cir. 2004). That is because absolute immunity “refers to protection from suit and not simply the assessment of liability.” Bush v. Rauch, 38 F.3d 842, 849 (6th Cir. 1994). Even aside from what Kentucky calls the immunity, it treats the immunity as one from suit by permitting interlocutory appeals from the denial of contractor immunity. An employer’s immunity from suit is the flip side of the employee’s freedom— immunity if you will — from having to file a suit to obtain coverage in the first place. A major concern of workers’ compensation systems is “that benefits be paid to deserving claimants as soon as possible” and without having to file a lawsuit. Edwards v. Dir., Office of Workers’ Comp. Programs, 932 F.2d 1325, 1327-28 (9th Cir. 1991) (per curiam) (granting collateral appeal of order staying award of benefits). A workers’ compensation system works best when there is no litigation on the front end or the back end. Because the Kentucky Supreme Court aptly treats this regime as “a contractor’s immunity from tort lawsuits,” Beaver, 279 S.W.3d at 528 n.1, Dixie and Georgia-Pacific may appeal.
True, Dixie and Georgia-Pacific are private companies. True also, the collateral-order exception “typically involves claims of immunity from suit by government officials,” as Black points out. Appellee’s Br. 3. But that does not make public-official claims of immunity the only ones available *584 under the exception. We have frequently-allowed such appeals by private parties for the same reason we permit interlocutory appeals by governmental actors: They are entitled to immunity from suit, whether under state or federal law. See, e.g., United Pet Supply, Inc. v. City of Chattanooga, 768 F.3d 464, 472 (6th Cir. 2014) (denial of qualified immunity for “private non-profit corporation”); Brotherton v. Cleveland, 173 F.3d 552, 559-60 (6th Cir. 1999) (same). In point of fact, the decision that gave birth to the collateral-order exception arose from a private corporation’s interlocutory appeal. Cohen, 337 U.S. at 546-47, 69 S.Ct. 1221 (permitting an appeal from an order denying a motion for security). The shortage of cases allowing interlocutory appeals from denials of contractor immunity stems not from the inapplicability of the collateral-order doctrine, but from the fact that the Kentucky workers’ compensation system is the exclusive remedy for workplace injuries when the worker, as here with Black, receives compensation. See Ky. Rev. Stat. § 342.690.
Other courts of appeals have applied the exception to private defendants as well. The Ninth Circuit, for example, exercised jurisdiction over an appeal by companies and individuals claiming intellectual property rights to Superman when the district court denied “a motion to strike pursuant to California’s anti-SLAPP statute” — a law that “stop[s] [ ] lawsuits early in the litigation process” when they are “brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.” DC Comics v. Pac. Pictures Corp., 706 F.3d 1009, 1013, 1015 (9th Cir. 2013) (quotation omitted). “California’s anti-SLAPP statute,” the court reasoned, “functions as an immunity from suit, and not merely as a defense against liability.” Id. Because “an immunity from suit is ‘imbued with a significant public interest’ that is not always present with regard to a defense against liability,” the Ninth Circuit ruled that “the denial of an immunity from suit — whether created by state or federal law — is an immediately appealable collateral order.” Id. (quotation omitted). Other courts of appeals have followed a similar path. See, e.g., Godin v. Schencks, 629 F.3d 79, 84-85 (1st Cir. 2010) (allowing interlocutory appeal for denial of anti-SLAPP motion under Maine law); Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138, 143 (2d Cir. 2013) (same under California’s anti-SLAPP statute); NCDR, L.L.C. v. Mause & Bagby, P.L.L.C., 745 F.3d 742, 752 (5th Cir. 2014) (same for Texas’s anti-SLAPP statute); see also McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1339-40 (11th Cir. 2007) (permitting appeal by military contractor due to “substantial claim to a true immunity from suit”).
We have jurisdiction to review this interlocutory order.
III.
The parties share common ground about most of the legal parameters concerning this appeal. They agree we give fresh review of the district court’s order denying statutory immunity, as with its order denying summary judgment. Cain, 236 S.W.3d at 589. They agree that, if Dixie is immune from suit, so is Dixie’s owner, Georgia-Pacific. And they do not challenge the basic contours of contractor immunity under Kentucky law.
“If Georgia-Pacific and Dixie are ‘contractors’ under § 342.610(2),” as wé previously explained, “they are immune from tort liability because Black was able to secure workers’ compensation benefits from Western.” Black, 516 Fed.Appx. at 414. “The purpose of KRS 342.610(2)(b),” the Supreme Court of Kentucky has added, “is not to shield owners or contractors *585 from potential tort liability but to assure that contractors and subcontractors provide workers’ compensation coverage.” Cain, 236 S.W.3d at 587. An injured employee’s “immediate employer! ]” ordinarily provides workers’ compensation benefits in exchange for which it gets immunity from tort lawsuits. Id. at 585. When the immediate employer fails to provide workers’ compensation, the contractor, “like any other employer! ],” is on the hook for workers’ compensation but gains statutory immunity if “the worker was injured while performing work that was ‘of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession.’ ” Id. (quotation omitted).
All of this leaves us with a three-part inquiry to determine immunity from suit under the Kentucky Workers’ Compensation Act. First, was Western “hired to perform” this work for Dixie? Cain, 236 S.W.3d at 588. Second, was Black’s work for Dixie “a ‘customary, usual, or normal’ part of Dixie’s business or ‘work that [Dixie] repeats with some degree of regularity’ ”? Black, 516 Fed.Appx. at 417 (quotation omitted). Third, was the work by Black “work that Dixie or similar businesses would normally perform or be expected to perform with employees”? Id.
Dixie meets each requirement. First, Dixie and Georgia-Pacific hired Western to transport and deliver paper rolls to Dixie’s Bowling Green factory. The carriage agreement required Western to “transport and deliver shipments of contract freight from facilities or other designated locations to the various destination points.” R. 14-2 at 2. And it specified that Western had a duty “to provide transportation services” to “GP and any GP subsidiary,” such as Dixie. Id.
It matters not that the carriage agreement does not spell out every step of the “transport and deliver[y]” process. Id. What matters is what Black acknowledges: He was “[w]orking and helping in the transportation of freight” while unloading the rubber mats. R. 84-9 at 21. Western was hired “to transport safely and deliver undamaged all freight.” R. 14-2 at 3. The rubber mats “insur[ed] that each load [was] properly loaded and secured,” a requirement of the carriage agreement. Id. If Black had not assisted in the unloading process by removing the rubber mats, Chinn would have had to do it himself. Even if “unloading the materials off the trucks was not one of [Black’s] job duties,” Black, 516 Fed.Appx. at 413, Black did not complete his run the instant the truck reached the loading dock. As the Supreme Court of Kentucky explained in a similar setting, a tractor-trailer driver is “a participant in the unloading process” when he releases and rolls straps. Interlock Indus., Inc. v. Rawlings, 358 S.W.3d 925, 928 (Ky. 2011). Black’s unloading of the rubber mats was part of the transportation and delivery for Dixie, “the task” Western was “hired to perform.” Cain, 236 S.W.3d at 588.
Second, unloading materials at the Bowling Green factory “is a ‘customary, usual, or normal’ part of Dixie’s business or ‘work that [Dixie] repeats with some degree of regularity.’ ” Black, 516 Fed.Appx. at 417 (quotation omitted). The relevant work is the “work being performed at the time of the injury.” Estate of Dohoney ex rel. Dohoney v. Int’l Paper Co., 560 Fed.Appx. 564, 569 (6th Cir. 2014). The question is whether “deliveries of raw paper materials to Dixie occurred on a regular or recurrent basis.” Black, 516 Fed.Appx. at 415. The answer is straightforward, as Dixie “received as many as fifty truck shipments of rolled paper raw materials during a typical week.” Id. Unless Dixie entered the business of producing raw paper in Bowling Green, it necessarily *586 needed to receive and unload regular deliveries of raw paper.
Third, the answer to the key-question, the one that needed more evidence on remand, turns on whether the transportation and delivery of raw paper materials amount to “work that Dixie or similar businesses would normally perform or be expected to perform with employees.” Black, 516 Fed.Appx. at 417. The evidence on remand shows this as well. Jeff Gottke, in charge of the Bowling Green facility, testified that Dixie is “responsible for unloading the product out of the truck.” R. 84-5 at 22. Charles W. Clowdis, Jr., an expert witness and logistics specialist, testified that “the work at issue here — the transport of raw paper materials from a supplier to a Dixie Consumer Products plant — is work that a company similar to Dixie might very well handle or be expected to handle with its own private fleet.” R. 84-20 at 15-16. And he based this opinion on the knowledge that at least one hundred companies, including paper companies such as Union Camp Fine Papers, have utilized private fleets of trucks for their transportation needs. Id. at 15.
“Even though” Dixie “may never perform that particular job with [its] own employees, [it] is still a contractor if the job is one that is usually a regular or recurrent part of [its] trade or occupation.” Fireman’s Fund Ins. Co. v. Sherman & Fletcher, 705 S.W.2d 459, 462 (Ky. 1986). As Black knows all too painfully, Dixie has equipment (forklifts and compactors) and employees for unloading trucks and receiving deliveries. Kentucky courts have granted statutory immunity to contractors when truck drivers, operating under “a motor-carrier agreement,” are injured loading their trucks at a contractor’s facility. Thornton v. Carmeuse Lime Sales Corp., 346 S.W.3d 297, 297-98 (Ky. Ct. App. 2010). And we see no reason to treat unloading differently. Dixie is entitled to statutory immunity from suit and, accordingly, so is Georgia-Pacific.
While this application of Kentucky law helps Dixie and Georgia-Pacific in the near term, it should help other workers in the long term. The premise of our decision is that someone injured in this setting will receive workers’ compensation no matter what — no matter whether the contractor (here the trucking company) contributes to the system or not. Because we treat the kind of work Black was doing as part and parcel of what Dixie does, that means a worker injured in this setting will receive compensation regardless of fault by a company in Dixie’s shoes or one in Western’s shoes. And that means Black (or someone like him) will always receive workers’ compensation. All of this also means that the immunity from a further lawsuit applies as well. This burden and this benefit lie at the heart of the trade-off built into any workers’ compensation system, as Black’s counsel acknowledged at oral argument. For one cannot “assure that contractors and subcontractors provide workers’ compensation coverage” for all workers without also assuring that they receive immunity from suit in return. Cain, 236 S.W.3d at 587.
For these reasons, we reverse.
DISSENT